**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

MATEUSZ MALITON et al.,

    Plaintiffs,

    v.

UNITED STATES OF AMERICA et al.,

    Defendants.

Civil Action No. 12-1610 (SRC)

**OPINION & ORDER**

**CHESLER**, **U.S.D.J.**

This matter comes before the Court on three motions: 1) the motion to dismiss any and all wrongful birth claims and to limit plaintiffs' damages to those for wrongful pregnancy only by Defendants Nicholas Marino, St. Joseph's Hospital & Medical Center, and Irina Tkach-Chubay (the "Marino Motion"); 2) the motion to dismiss any and all wrongful birth claims and to limit plaintiffs' damages to those for wrongful pregnancy only by Defendant Roger Kierce (the "Kierce Motion"); and 3) the motion for partial summary judgment by Defendant the United States of America. For the reasons stated below, the three motions will be granted.

This case arises from a dispute over allegations of medical malpractice resulting in the wrongful birth of a child, Plaintiff Mateusz Maliton ("Mateusz"), who has Downs' syndrome. The Plaintiffs are Mateusz and his mother and father, Maria Kapalka and Marek Maliton. The Second Amended Complaint ("SAC") alleges that Ms. Kapalka received medical treatment from Defendant physician Dr. Tkach-Chubay at North Hudson Community Action Corporation Health Center ("North Hudson"). The SAC alleges that North Hudson Community Action Corporation Health Center is a federally qualified health center. The SAC also alleges that Ms. Kapalka

received medical treatment from Defendant physicians Drs. Marino and Kierce at Defendant St. Joseph's Hospital and Medical Center ("St. Joseph's").

Very briefly, the SAC alleges the following facts. In 2009, Ms. Kapalka received pre-natal care from Dr. Tkach-Chubay at North Hudson, and she was advised to have a tubal ligation performed during the delivery of the child. The child, Tomasz, was born in a delivery performed at St. Joseph's, but no tubal ligation was performed. Despite this, staff at North Hudson informed Ms. Kapalka that a tubal ligation had been performed. Subsequently, Mr. Kapalka became pregnant again, and gave birth to Mateusz, who was born with Downs' syndrome.

The SAC contains five claims, all for negligence on the part of the treating physician and hospital entity Defendants, seeking damages related to the birth of Mateusz, including the costs of raising him. Plaintiffs' opposition brief states their position candidly:

> The case before this Court is one of first impression. No reported New Jersey case has addressed a cause of action for wrongful pregnancy arising out of a failed sterilization procedure which, as here, has resulted in the subsequent conception and birth of a child with a birth defect.
> . . .
> Plaintiffs do not claim damages based on wrongful birth since Ms. Kapalka was not deprived of the opportunity to terminate her pregnancy. Rather, she chose to give birth to her son after prenatal testing disclosed the birth defect.
>
> Notwithstanding, Plaintiffs maintain that . . . they should be entitled to recover the extraordinary medical and life care expenses associated with raising their infant son, and should not be confined to the limited damages awarded in prior New Jersey cases where the wrongful pregnancy resulted in the birth of a normal child. Plaintiffs assert that damages should be expanded in wrongful pregnancy cases such as the present one so that New Jersey's previously undeveloped wrongful pregnancy doctrine will more appropriately correspond to its related and fully-formed law on wrongful birth.

(Pls.' Opp. Br. 1-2.) Plaintiffs thus begin by conceding that their claims are not valid under existing New Jersey law, and that, in bringing them, they ask this Court to develop and expand

New Jersey law.  The first question is, then: can it?

The Third Circuit has held: "In adjudicating a case under state law, we are not free to impose our own view of what state law should be; rather, we are to apply existing state law as interpreted by the state's highest court in an effort to predict how that court would decide the precise legal issues before us."[1]  Horsehead Indus., Inc. v. Paramount Commc'ns, Inc., 258 F.3d 132, 140 (3d Cir. 2001).  Furthermore:

> When the state's highest court has not addressed the precise question presented, a federal court must predict how the state's highest court would resolve the issue. Although not dispositive, decisions of state intermediate appellate courts should be accorded significant weight in the absence of an indication that the highest state court would rule otherwise.

Orson, Inc. v. Miramax Film Corp., 79 F.3d 1358, 1373 n.15 (3d Cir. 1996) (citations omitted). Plaintiffs contend that the New Jersey Supreme Court has not addressed the precise question presented here.  This Court must therefore predict how the New Jersey Supreme Court would resolve this issue.

Plaintiffs' opposition brief, while contending that this case presents an issue of state law of first impression, and conceding that existing law does not allow them the full extent of the damages they seek, fails to persuade this Court that, nonetheless, the New Jersey Supreme Court, hearing these motions, would decide them in their favor.  Plaintiffs offer this Court no basis to

---

[1] This holding alone requires a decision against Plaintiffs, whose argument strives to say what New Jersey law *should be.*  As the Third Circuit held, federal courts may not impose their views of what state law *should be.*  They base decisions on what state law *is.*  See also City of Philadelphia v. Lead Indus. Ass'n, 994 F.2d 112 (3d Cir. 1993) ("Federalism concerns require that we permit state courts to decide whether and to what extent they will expand state common law.  Our role is to apply the current law of the appropriate jurisdiction, and leave it undisturbed.")

3

predict a resolution of these questions of state law in their favor by New Jersey's highest court. To the contrary, Plaintiffs' presentation of New Jersey law supports a prediction in favor of Defendants.

Plaintiffs' argument for why this Court should develop and expand New Jersey law is as follows. New Jersey tort law recognizes a cause of action for wrongful pregnancy, negligence in the performance of a sterilization procedure. Plaintiff states that there are three relevant New Jersey state court cases: J.P.M., Portadin, and Betancourt. J.P.M. and Portadin are Appellate Division cases; Betancourt is a trial court decision. The New Jersey Supreme Court offered this summary and commentary on these cases:

> Two recent decisions of the Appellate Division highlight the problem of assessing damages in wrongful conception, wrongful birth and wrongful life cases. In *P. v. Portadin*, 179 N.J. Super. 465 (1981), a husband and wife sued for certain expenses resulting from the birth of a normal child following the allegedly negligent performance of a sterilization procedure upon the wife. Relying on *Berman*, supra, the Appellate Division concluded that plaintiffs were precluded from recovering any expenses for raising their child. The court also concluded, however, that the wife may recover for 'the pain and suffering accompanying her pregnancy and delivery and for the wages lost during that period, and that her husband may recover for loss of consortium and for the medical expenses incurred which are attributable to the pregnancy and delivery.' *P., supra*, 179 N.J. Super. at 472. The court disapproved *Betancourt v. Gaylor*, 136 N.J. Super. 69 (Law Div.1975), which held that the costs of raising a child could be recovered in an action for "wrongful pregnancy" based on negligent sterilization when a normal child is born. In another case, *J.P.M. v. Schmid Laboratories, Inc.*, 178 N.J. Super. 122 (1981), a husband and wife sued the manufacturer of contraceptive devices in negligence, breach of warranty and strict liability alleging that a defect in a condom caused the wife to become pregnant and give birth to normal twins. The Appellate Division held that interspousal immunity did not preclude a cross-claim for contribution by the manufacturer against the husband for negligent use of the condom. The court declined to permit damages for costs of raising and educating the twins. In this opinion, we neither approve nor disapprove of those decisions.

Schroeder v. Perkel, 87 N.J. 53, 69 n.2 (1981). From this summary, we learn that the Appellate Division rejected the holding of the trial court in Betancourt, and that the New Jersey Supreme

4

Court did not indicate what it thought about the decisions in J.P.M. and Portadin.

Plaintiffs note that, in J.P.M. and Portadin, the Appellate Division relied upon the New Jersey Supreme Court's decision in Berman v. Allan, 80 N.J. 421, 425 (1979), a case in which parents brought suit against physicians who allegedly provided negligent prenatal care, resulting in the birth of a child with Downs' syndrome:

> The claim for damages asserted on behalf of the infant Sharon has aptly been labeled a cause of action grounded upon "wrongful life." Sharon does not contend that absent defendants' negligence she would have come into the world in a normal and healthy state. There is no suggestion in either the pleadings below or the medical literature which we have scrutinized that any therapy could have been prescribed which would have decreased the risk that, upon birth, Sharon would suffer from Down's Syndrome. Rather, the gist of the infant's complaint is that had defendants informed her mother of the availability of amniocentesis, Sharon would never have come into existence.
>
> The claim for damages asserted on behalf of the infant Sharon has aptly been labeled a cause of action grounded upon "wrongful life." Sharon does not contend that absent defendants' negligence she would have come into the world in a normal and healthy state. There is no suggestion in either the pleadings below or the medical literature which we have scrutinized that any therapy could have been prescribed which would have decreased the risk that, upon birth, Sharon would suffer from Down's Syndrome. Rather, the gist of the infant's complaint is that had defendants informed her mother of the availability of amniocentesis, Sharon would never have come into existence.
>
> As such, this case presents issues different from those involved in malpractice actions where a plaintiff asserts that a defendant's deviation from sound medical practices increased the probability that an infant would be born with defects. Nor are we here confronted with a situation in which an individual's negligence while a child was in gestation caused what otherwise would have been a normal and healthy child to come into the world in an impaired condition. Here, defendants' alleged negligence neither caused the mongoloid condition nor increased the risk that such a condition would occur. In the words of the *Gleitman* majority, "the infant plaintiff [asserts] . . . not that [she] should have been born without defects but [rather] that [she] should not have been born at all. . ." 49 N.J. at 28. In essence, Sharon claims that her very life is "wrongful."

Id. at 426-27 (citations omitted). The Court then used clear, dramatic language to explain why it

rejected the wrongful life claim:

> One of the most deeply held beliefs of our society is that life – whether experienced with or without a major physical handicap – is more precious than non-life. Concrete manifestations of this belief are not difficult to discover. The documents which set forth the principles upon which our society is founded are replete with references to the sanctity of life. The federal constitution characterizes life as one of three fundamental rights of which no man can be deprived without due process of law. U.S. Const., Amends. V and XIV. Our own state constitution proclaims that the "enjoying and defending [of] life" is a natural right. N.J. Const. (1947), Art. I, § 1. The Declaration of Independence states that the primacy of man's "unalienable" right to life is a "self-evident truth." Nowhere in these documents is there to be found an indication that the lives of persons suffering from physical handicaps are to be less cherished than those of non-handicapped human beings.
>
> State legislatures – and thus the people as a whole – have universally reserved the most severe criminal penalties for individuals who have unjustifiably deprived others of life. Indeed, so valued is this commodity that even one who has committed first degree murder cannot be sentenced to death unless he is accorded special procedural protections in addition to those given all criminal defendants. Moreover, it appears that execution is constitutionally impermissible unless the crime which a defendant has perpetrated was one which involved the taking of another's life. Again, these procedural protections and penalties do not vary according to the presence or absence of physical deformities in the victim or defendant. It is life itself that is jealously safeguarded, not life in a perfect state.
>
> Finally, we would be remiss if we did not take judicial notice of the high esteem which our society accords to those involved in the medical profession. The reason for this is clear. Physicians are the preservers of life.
>
> No man is perfect. Each of us suffers from some ailments or defects, whether major or minor, which make impossible participation in all the activities the world has to offer. But our lives are not thereby rendered less precious than those of others whose defects are less pervasive or less severe.
>
> We recognize that as a mongoloid child, Sharon's abilities will be more circumscribed than those of normal, healthy children and that she, unlike them, will experience a great deal of physical and emotional pain and anguish. We sympathize with her plight. We cannot, however, say that she would have been better off had she never been brought into the world. Notwithstanding her affliction with Down's Syndrome, Sharon, by virtue of her birth, will be able to love and be loved and to experience happiness and pleasure – emotions which are truly the essence of life and which are far more valuable than the suffering she may endure. To rule otherwise would require us to disavow the basic assumption upon which our society

>   is based. This we cannot do.
>
>   Accordingly, we hold that Sharon has failed to state a valid cause of action founded upon "wrongful life."

Id. at 421-30 (citations omitted).  With these moving words, the New Jersey Supreme Court made clear that a child born with Downs' syndrome does not have a cause of action for negligence that resulted in her having been born.

Plaintiffs argue that Schroeder, decided by the New Jersey Supreme Court two years later, shows a "sea change in the law of wrongful birth and wrongful life following . . . Berman." (Pls.' Opp. Br. 6.)  In a nutshell, in Schroeder, the New Jersey Supreme Court allowed the parents in a wrongful birth suit to seek the incremental medical costs of raising a child with a hereditary birth defect from the allegedly negligent physicians who failed to detect and inform the parents of the risk.  Schroeder, 87 N.J. at 57.

Plaintiffs do not say much about what that "sea change" in the law was, but imply that it was the fact that the New Jersey Supreme Court allowed the parents in a wrongful birth case to seek future medical costs.  Plaintiffs do not explain the relevance of Schroeder to the instant case.  Schroeder was a wrongful birth case, and Plaintiffs have stated affirmatively that they have brought a wrongful pregnancy case, not a wrongful birth case.  Moreover, the New Jersey Supreme Court explained its reasoning as follows:

>   In *Berman*, we recognized a separate cause of action of parents for the emotional distress in giving birth to a child with Down's Syndrome.  Parents have a right of their own either to accept or reject a parental relationship, and the deprivation of that right by the negligent misconduct of another creates a cause of action in the parents. In *Berman*, the parents were deprived of the choice whether to bear the emotional burden of an afflicted child.  In the present case, Mr. and Mrs. Schroeder were deprived of the choice whether to conceive a second child with cystic fibrosis whose birth would impose extensive medical expenses upon them.

Id. at 66. This makes clear that the New Jersey Supreme Court understood Berman and Schroeder to be cases about the deprivation of the right of parents to make a choice about whether to bear a child. Plaintiffs in the instant case, however, have affirmatively stated that they were not deprived of this right:

> Plaintiffs do not claim damages based on wrongful birth since Ms. Kapalka was not deprived of the opportunity to terminate her pregnancy. Rather, she chose to give birth to her son after prenatal testing disclosed the birth defect.

(Pls.' Opp. Br. 1.)

Plaintiffs do not explain how, then, this Court could rely on Berman or Schroeder to predict a New Jersey Supreme Court decision in their favor were this case before it. Schroeder supports a claim for a child's future medical costs when parents have been deprived of their right to make a choice about whether to bear a child. Plaintiffs state that they were not deprived of that right.[2] How, then, do Berman or Schroeder support their claims? Plaintiffs do not persuade this Court that Berman or Schroeder support a prediction that the New Jersey Supreme Court would decide these motions in their favor.[3]

Plaintiffs next contend that "[t]he frontier was further advanced" by the New Jersey Supreme Court's decision in Procanik. (Pls.' Opp. Br. 8.) In Procanik, the New Jersey Supreme Court recognized an infant's "right to recover the extraordinary expenses necessitated by his birth defects," calling it a "wrongful life" action. Procanik v. Cillo, 97 N.J. 339, 356 (1984). Procanik

---

[2] Rather, the Plaintiff parents here acknowledge that they had the opportunity to choose whether to continue the pregnancy or terminate it, and they chose to continue it. They were not deprived of their right to make a choice.

[3] Moreover, in Schroeder, the New Jersey Supreme Court limited damages for the deprivation of the right to choose to bear a child to the "incremental medical costs" for a child born with a birth defect. 87 N.J. at 71.

does contain some language that appears to support Plaintiffs' position: "The essence of the infant's claim is that the defendant doctors wrongfully deprived his mother of information that would have prevented his birth." Id. at 348. If this fairly and completely characterized the Court's decision in Procanik, based on the allegations in the SAC, Mateusz might have such a claim here. The problem is that other statements in Procanik show that the New Jersey Supreme Court placed important restrictions on a wrongful life action. The most relevant ones appear in this language:

> Analysis of the infant's cause of action begins with the determination whether the defendant doctors owed a duty to him. The defendant doctors do not deny they owed a duty to the infant plaintiff, and we find such a duty exists. In evaluating the infant's cause of action, we assume, furthermore, that the defendant doctors were negligent in treating the mother. Moreover, we assume that their negligence deprived the parents of the choice of terminating the pregnancy and of preventing the birth of the infant plaintiff.

Id. at 348-49 (citations omitted). Note that, once again, the New Jersey Supreme Court has pointed to the crucial role of depriving the parents of the choice of terminating the pregnancy. This language alone undercuts any argument that Procanik supports a prediction that the New Jersey Supreme Court would decide this motion in Plaintiffs' favor.

Moreover, this language in Procanik supports the prediction that the New Jersey Supreme Court, in considering the instant motion, would begin the analysis with the question of whether the defendant doctors owed a duty to the infant with birth defects. This is a crucial question that Plaintiffs do not discuss in their brief: did the doctors whose alleged negligence resulted in the mother's not being sterilized and not knowing that fact have a duty to future children not yet conceived? At this juncture, it is sufficient to note that Plaintiffs have made no case to support the prediction that the New Jersey Supreme Court would find such a duty. Without a duty, there can be no action in negligence for the breach of that duty.

9

> The crux of Plaintiffs' argument for expansion of existing New Jersey law is this:
>
> > If, as the Appellate Division determined in its 1981 decision in *P. v. Portadin*, *supra*, there is truly no distinction between a 'wrongful pregnancy' and a 'wrongful birth' case, then the damages recoverable in such actions should be uniform and consistent. To reach such a harmonious result, the damages in wrongful pregnancy actions should no longer be unrealistically limited. Rather, to bring them in congruity with the present status of New Jersey's law on 'wrongful birth' and 'wrongful life,' all extraordinary medical and life care expenses should likewise be recoverable in a wrongful pregnancy case. . .

(Pls.' Opp. Br. 9.) Crucially, this key part of Plaintiffs' argument begins with "if." It is certainly true that, as Plaintiffs assert, the Appellate Division, in Portadin, stated: "We see no distinction between a so-called 'wrongful birth' action, as in *Berman*, and the so-called 'wrongful pregnancy' action referred to in *Betancourt v. Gaylor*." 179 N.J. Super. at 470. Plaintiffs, however, take this statement out of context. The Portadin court was not holding that there are absolutely *no* differences between a wrongful birth case and a wrongful pregnancy case. Consider the quote in context:

> Plaintiffs further argue that *Berman* is distinguishable because it involved parents who wanted a child but had an abnormal child where as here, they did not want any child, even a normal child. They rely on *Betancourt v. Gaylor*, 136 N.J. Super. 69, 77 (1975), wherein the Law Division held that child-rearing costs could be recovered in an action for wrongful pregnancy based on negligent sterilization where a normal child is born. We see no distinction between a so-called "wrongful birth" action, as in *Berman*, and the so-called "wrongful pregnancy" action referred to in *Betancourt v. Gaylor, supra*. In our view, the rule laid down in *Berman* is applicable here and precludes recovery for the future expense which the parents may incur in raising, educating and supervising the child. This result finds persuasive support in *Rieck v. Medical Protective Co. of Fort Wayne, Ind.*, 64 Wis.2d 514, 219 N.W.2d 242 (Sup.Ct.1974), wherein the court refused to award damages to parents of a normal child who claimed that defendants, a clinic and an obstetrician, failed to detect Mrs. Rieck's pregnancy in time to permit an abortion. What the Wisconsin Supreme Court stated there is worthy of being repeated . . .

Id. at 470 (citations omitted). When considered in context, the statement about seeing no distinction was offered as support for the holding that "the rule laid down in *Berman* is applicable

10

here and precludes recovery for the future expense which the parents may incur in raising, educating and supervising the child." Id.  The statement Plaintiffs cite is *dicta*, and *dicta* that can mislead when quoted out of context.  The Portadin court held in no uncertain terms that Berman barred recovery of future child-rearing expenses in a wrongful pregnancy case.

This is New Jersey law, as it is now.  Plaintiffs want it changed.  Plaintiffs appear to believe that Portadin was wrongly decided, but this Court cannot change state law to what it should be.  It must apply state law as it is.  And Plaintiffs have cited no authority that supports the conclusion that the holding of Portadin – that Berman bars recovery of future child-rearing expenses in a wrongful pregnancy case – is no longer good law in New Jersey.

While this point provides a sufficient basis to predict that the New Jersey Supreme Court would not decide this motion in Plaintiffs' favor, there is more supporting this Court's conclusion. As discussed, the New Jersey Supreme Court has repeatedly expressed that, in its decisions, it has sought to remedy a deprivation of the parents' choice of avoiding conception.  The parents in this case affirmatively state that they were not deprived of this choice.  Plaintiffs have not confronted this point in their brief, and this Court predicts that this issue is likely to determine how the New Jersey Supreme Court would decide these motions.

Defendants argue that this Court should limit Plaintiffs to a claim for wrongful pregnancy, and that Plaintiffs have no cause of action for wrongful birth.  In response, Plaintiffs disclaimed any wrongful birth claim.  Furthermore, Plaintiffs have stated that the Complaint does not bring any wrongful birth claims.  To the extent that the Complaint could be read to encompass any

wrongful birth claims, such claims will be dismissed with prejudice.[4]

Plaintiffs' claims are limited to a claim for wrongful pregnancy. Under Portadin, Plaintiffs' damages are limited to the following:

> [W]e agree with plaintiffs that the trial judge erred in precluding them from recovering damages for the medical expenses incurred during the course of Mrs. P's pregnancy and delivery. We do not read *Berman* as precluding the recovery of such expenses. We are satisfied that Mrs. P may recover damages for the pain and suffering accompanying her pregnancy and delivery and for the wages lost during that period, and that her husband may recover for loss of consortium and for the medical expenses incurred which are attributable to the pregnancy and delivery.

179 N.J. Super. at 472. Plaintiffs' damages are limited to medical expenses incurred in Ms. Kapalka's pregnancy and delivery, pain and suffering from pregnancy and delivery, lost wages during the pregnancy, and loss of consortium during the pregnancy. All three of Defendants' motions will be granted.

For these reasons,

**IT IS** on this 20th day of January, 2016,

**ORDERED** that Defendants' motions to dismiss (Docket Entry Nos. 57 and 62) are both **GRANTED**; and it is further

**ORDERED** that Defendant's partial motion for summary judgment (Docket Entry No. 61) is **GRANTED**; and it is further

---

[4] The Marino and Kierce motions seek to dismiss the wrongful birth claims, while the United States moves for summary judgment on the wrongful birth claims. As the United States contends in its opening brief, it relies upon the same grounds as the Marino and Kierce motions, but moves under Federal Rule of Civil Procedure 56 because some defendants have relied on facts external to the pleadings. In arriving at today's decision, this Court has not relied on factual allegations outside the pleadings, but on the disclaimer made by Plaintiffs in their opposition brief. Since Plaintiffs stated in their opposition brief that the SAC contains no claims sounding in wrongful birth, this Court finds that it is more appropriate to dismiss any such disclaimed claims, rather than enter judgment on them.

**ORDERED** that, to the extent that the Second Amended Complaint asserts claims sounding in wrongful birth, such claims are hereby **DISMISSED** with prejudice; and it is further

**ORDERED** that Plaintiffs are limited to a claim for wrongful pregnancy, and Plaintiffs are not entitled to damages except for medical expenses incurred in Ms. Kapalka's pregnancy and delivery, pain and suffering from pregnancy and delivery, lost wages during the pregnancy, and loss of consortium during the pregnancy.

    s/ Stanley R. Chesler
    Stanley R. Chesler, U.S.D.J.